Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Michael Vanunu (MV 4167)
Philip P. Nash (PN 0519)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and          Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

Plaintiffs,

      -against-                                                    **Plaintiff Demands a Trial by Jury**

BIG APPLE MED EQUIPMENT, INC., DAVID
ABAYEV, ALEKSANDR MOSTOVOY, D.C.,
SURESH PAULUS, D.O., ASHLEY KIAEI, D.C.,
PETER MARGULIES, D.C., and JOHN DOE
DEFENDANTS 1-10,

Defendants.
-------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

      1.    This action seeks to recover more than $122,000.00 that the Defendants have

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through Defendant, Big Apple Med Equipment, Inc. ("Big Apple").

2.      Big Apple is a retailer of DME and OD that is owned, operated and controlled by David Abayev ("Abayev"). In short, Abayev devised a scheme in conjunction with various healthcare providers, including Defendants, Aleksandr Mostovoy, D.C. ("Mostovoy"), Suresh Paulus, D.O. ("Paulus"), Ashley Kiaei, D.C. ("Kiaei"), and Peter Margulies, D.C. ("Margulies") either directly or through others who are not readily identifiable to GEICO, to submit large volumes of billing to GEICO and other New York automobile insurance companies for purportedly providing Fraudulent Equipment that was medically unnecessary, illusory, and otherwise not reimbursable.

3.      Based upon prescriptions for Fraudulent Equipment issued by various healthcare providers, including Mostovoy, Paulus, Kiaei, and Margulies (collectively, the "Referral Defendants"), Big Apple and Abayev (collectively the "Supplier Defendants") provided Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

4.      GEICO seeks to recover more than $122,000.00 that has been wrongfully obtained by the Supplier Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,000,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Big Apple because:

(i)     The Supplier Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements between the Defendants and other health care providers – either directly or through third-party individuals not presently identifiable.

(ii)    The Supplier Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols with healthcare providers, including the Referral Defendants – either directly or through third-party individuals not presently identifiable – solely to financially enrich the Defendants, other healthcare providers, and others not presently known, rather than to treat the Insureds.

(iii)   The bills for Fraudulent Equipment submitted to GEICO by the Supplier Defendants fraudulently misrepresented that Fraudulent Equipment were provided to Insureds when the Insureds never received the Fraudulent Equipment.

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Supplier Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent what was provided to Insureds.

5.      The Defendants fall into the following categories:

(i)     Defendant Big Apple is a New York corporation that purports to purchase DME and OD from wholesalers, purports to provide Fraudulent Equipment to automobile accident victims, and bills New York automobile insurance companies, including GEICO, for Fraudulent Equipment.

(ii)    Defendant Abayev owns, operates and controls Big Apple, and uses the corporation to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)   Defendant Mostovoy is a chiropractor licensed to practice in New York and issued prescriptions for Fraudulent Equipment in the names of automobile accident victims that received treatment at a multi-disciplinary medical office located at 218-02 Hempstead Avenue, Queens Village, New York, which in turn were provided to and billed by the Supplier Defendants to New York automobile insurance companies, including GEICO.

(iv) Defendant Paulus is a physician licensed to practice medicine in New York and issued prescriptions for Fraudulent Equipment in the name of automobile accident victims who received treatment at a multi-disciplinary medical office located at 2386 Jerome Avenue, Bronx, New York, which were in turn provided to and billed by the Supplier Defendants to New York automobile insurance companies, including GEICO.

(v) Defendant Kiaei is a chiropractor licensed to practice in New York and issued prescriptions for Fraudulent Equipment in the names of automobile accident victims that received treatment at a multi-disciplinary medical office located at 615 Seneca Avenue, Ridgewood, New York, which in turn were provided to and billed by the Supplier Defendants to New York automobile insurance companies, including GEICO.

(vi) Defendant Margulies is a chiropractor licensed to practice in New York and issued prescriptions for Fraudulent Equipment in the names of automobile accident victims that received treatment at a multi-disciplinary medical office located at 219 Hempstead Turnpike, West Hempstead, New York, which in turn were provided to and billed by the Supplier Defendants to New York automobile insurance companies, including GEICO.

6. As discussed below, the Defendants always have known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i) The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – as a result of unlawful financial arrangements between the Defendants and other health care providers – either directly or through third-party individuals not presently identifiable – and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(ii) The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols designed by the Defendants and other healthcare providers – either directly or through third-party individuals not presently identifiable – solely to financially enrich the Defendants, other healthcare providers, and others not presently known, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii) The bills for Fraudulent Equipment submitted by the Supplier Defendants to GEICO – and other New York automobile insurers – fraudulently misrepresented that the Supplier Defendants provided Fraudulent Equipment to Insureds when the Insureds never received the Fraudulent Equipment; and

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Supplier Defendants to GEICO – and other New York automobile insurers – fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds.

7.    As such, the Supplier Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Big Apple.

8.    The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme.

9.    Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than January 1, 2019 and the scheme has continued uninterrupted since that time.

10.    As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $122,000.00.

## THE PARTIES

**I.**    **Plaintiffs**

11.    Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.**    **Defendants**

12.    Defendant Big Apple is a New York corporation with its principal place of business in Fresh Meadows, New York. Big Apple was incorporated on November 27, 2018, is

owned, operated and controlled by Abayev, and has been used by Abayev, with the assistance of the Referral Defendants and others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant Abayev resides in and is a citizen of New York.  Abayev is not and has never been a licensed healthcare provider. Abayev owns and controls Big Apple and entered into unlawful financial arrangements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals not presently identifiable, in exchange for referrals to Big Apple for the Fraudulent Equipment.

14.     Defendant Mostovoy resides in and is a citizen of New York. Mostovoy became a licensed chiropractor in New York on or about August 3, 2001. Mostovoy is the purported owner of APAK Chiropractic, P.C. ("APAK Chiro") and purportedly treated automobile accident victims at a multi-disciplinary medical office that catered to a high volume of no-fault insurance patients located at 218-02 Hempstead Avenue, Queens Village, New York ("the Hempstead Avenue Clinic"). Mostovoy issued large numbers of prescriptions for Fraudulent Equipment from the Hempstead Avenue Clinic that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

15.     Mostovoy is no stranger to engaging in fraudulent schemes against GEICO. By way of example, on or about May 30, 2018, Mostovoy was named in a lawsuit filed in United States District Court for the Eastern District of New York in an action entitled Government Employees Insurance Company et al. v. Epione Medical P. C. et al., Case No. 1:18-cv-03159-SJ-SJB in which Mostovoy and others were alleged to have "sold" their licenses to unlicensed laypersons who then illegally owned and controlled both the Hempstead Avenue Clinic and the professional corporations that operated therefrom, including APAK Chiro, and submitted

fraudulent claims seeking No-Fault benefits for services purportedly provided to GEICO insureds.

16.     Additionally, in 2010, Mostovoy was arrested and charged with insurance fraud for his involvement in a scheme in which individuals known as "runners" were paid to bring motor vehicle accident victims to a multidisciplinary clinic located in Queens, New York where they were directed to undergo a significant number of medically unnecessary treatments and tests such as examinations, acupuncture treatment, chiropractic care, physical therapy and diagnostic testing for which the providers then sought reimbursement from various New York State automobile insurers.

17.     In 2015, Mostovoy's chiropractic license was suspended as a result of an Attempted Petit Larceny Class B misdemeanor conviction for 12 months, with 11 months stayed suspension, and 12 months of probation.   Upon information and belief, the misdemeanor conviction stemmed from Mostovoy's 2010 arrest and his involvement in the runner scheme.

18.     Defendant Paulus resides in and is a citizen of New York. Paulus became licensed to practice medicine in New York on or about August 4, 1998. Paulus purportedly treated automobile accident victims on behalf of Metro Pain Specialists, P.C. ("Metro Pain") at 2386 Jerome Avenue, Bronx, New York ("the Jerome Avenue Clinic"). Paulus was one of multiple healthcare providers who issued large numbers of prescriptions for Fraudulent Equipment from Jerome Avenue Clinic that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

19.     Paulus is no stranger to fraudulent schemes. Paulus was sued by GEICO as part of a scheme similar to the conduct alleged in this Complaint whereby Paulus issued fraudulent prescriptions for medically unnecessary DME and OD, which were then directed to certain DME

retailers, as part of a predetermined treatment protocol and in exchange for unlawful kickbacks from the DME retailers. See Gov't Emples. Ins. Co., et al. v. AZcare, Inc., et al., 1:20-cv-05312 (E.D.N.Y. 2020).

20.     Defendant Kiaei resides in and is a citizen of New York. Kiaei became a licensed chiropractor in New York on or about August 7, 2012. Kiaei purportedly treated automobile accident victims at a multi-disciplinary medical office that catered to a high volume of no-fault insurance patients located at 615 Seneca Avenue, Ridgewood, New York ("the Seneca Avenue Clinic"), and issued many prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

21.     Defendant Margulies resides in and is a citizen of New York. Margulies became a licensed chiropractor in New York on or about May 9, 1980. Margulies purportedly treated automobile accident victims at a multi-disciplinary medical office that catered to a high volume of no-fault insurance patients located at 219 Hempstead Turnpike, West Hempstead, New York ("the Hempstead Turnpike Clinic"), and issued many prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

23.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

24.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

26.     GEICO underwrites automobile insurance in the State of New York.

**I.      An Overview of the Pertinent Laws**

**A.      Pertinent Laws Governing No-Fault Insurance Reimbursement**

27.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

28.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

29.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

30.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

31.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

32.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

33.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

34.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

35.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

36.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as

"Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

37.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

38.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

39.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

40.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

11

41.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

42.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

43.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

44.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

45.     As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State

> Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2

46. As indicated by the New York Fee Schedule, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

47. For Fee-Schedule items, Noridian Healthcare Solutions, LLC ("Noridian"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

48. The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Noridian. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Noridian.

49.     Additionally, many Fee Schedule items involve HCPCS Codes for OD that has either been prefabricated, custom-fitted and/or customized. Noridian published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Noridian has identified who is qualified to properly provide custom-fitted OD.

50.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

      (i)     The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

      (ii)    The prescription for DME or OD is not based any unlawful financial arrangement;

      (iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription; and

      (iv)   The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient.

## II.      The Defendants' Fraudulent Scheme

51.     Beginning in or about January 2019, the Defendants masterminded and implemented a complex fraudulent scheme in which Big Apple was used as a vehicle to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

### A.      Overview of the Defendants' Fraudulent Schemes

52.     Between January 1, 2019 and the present, the Supplier Defendants, through Big Apple, submitted more than $1,600,000.00 in fraudulent claims to GEICO seeking

reimbursement for the Fraudulent Equipment. To date, the Supplier Defendants have wrongfully obtained more than $122,000.00 from GEICO, and there is more than $1,000,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Supplier Defendants continue to seek payment of from GEICO.

53.     Abayev used Big Apple to directly obtain No-Fault Benefits and maximize the amount of No-Fault Benefits he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for Fee Schedule items, including custom fitted lumbar sacral orthotics ("LSO"), custom fitted knee orthotics, and cervical traction units.

54.     As part of this scheme, the Supplier Defendants obtained prescriptions for medically unnecessary custom-fitted OD and cervical traction units from the Referral Defendants and other healthcare providers who treated Insureds at multi-disciplinary medical offices in the New York metropolitan region that cater to high volumes of no-fault insurance patients, including the Hempstead Avenue Clinic, the Jerome Avenue Clinic, the Seneca Avenue Clinic, and the Hempstead Turnpike Clinic (collectively, the "Clinics").

55.     Once the Supplier Defendants received the medically unnecessary prescriptions from healthcare providers, including the Referral Defendants, the Supplier Defendants would submit either NF-3 or HCFA-1500 forms to GEICO with HCPCS Codes seeking reimbursement for the Fraudulent Equipment.

56.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Supplier Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

57.     However, in a substantial majority of the charges for Fraudulent Equipment identified in Exhibit "1" – to the extent that any equipment was actually provided to the Insureds – the Supplier Defendants did not provide the Fraudulent Equipment identified on the bills submitted to GEICO.

58.     Even more, to the extent that the prescriptions, which were used by the Supplier Defendants to support the charges to GEICO, for Fraudulent Equipment identified specific HCPCS Codes, the Supplier Defendants virtually never provided the Insureds with the specifically identified Fraudulent Equipment.

59.     Instead, as part of this scheme, the Supplier Defendants provided Insureds with Fraudulent Equipment that did not contain all the features required by the applicable HCPCS Codes, to the extent that any Fraudulent Equipment was provided to the Insureds in the first instance.

60.     For example, in many instances, the Supplier Defendants billed GEICO using HCPCS Codes that required the Supplier Defendants to custom-fit the Fraudulent Equipment to the Insureds. However, the Supplier Defendants never custom-fitted the Fraudulent Equipment as required under the Fee Schedule. Then, the Supplier Defendants submitted bills to GEICO with HCPCS Codes for custom-fit Fraudulent Equipment in order to obtain a significantly higher maximum reimbursement rate under the Medicaid Fee Schedule.

61.     In fact, the Fraudulent Equipment actually provided to Insureds – and again to the extent that any Fraudulent Equipment was actually provided – would qualify under different HCPCS Codes that had significantly lower maximum reimbursement rates than the HCPCS Codes identified in the bills submitted by the Supplier Defendants.

62.     As such, the Supplier Defendants engaged in a pattern of submitting bills to GEICO, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

63.     The Supplier Defendants were able to perpetrate this scheme due to unlawful financial agreements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals who are not presently identifiable.

64.     Upon information and belief, in exchange for various forms of consideration from the Supplier Defendants – either directly or through third-party individuals who are not presently identifiable – the Referral Defendants and other healthcare providers would regularly and intentionally provide the same type of medically unnecessary Fraudulent Equipment to virtually every Insured that was injured in a motor vehicle accident. Thereafter, someone on behalf of the Referral Defendants and other healthcare providers would typically – without going through the Insureds – provide the prescriptions to the Supplier Defendants.

65.     By providing the medically unnecessary prescriptions for Fraudulent Equipment to the Supplier Defendants, the Referral Defendants and other healthcare providers intentionally enabled the Supplier Defendants to bill GEICO for: (i) Fraudulent Equipment that were not reasonable or medically necessary; (ii) Fraudulent Equipment that were never provided to Insureds; (iii) the Fraudulent Equipment did not represent the HCPCS codes contained in the bills to GEICO; and (iv) Fraudulent Equipment that were otherwise not reimbursable.

**B.      The Defendants' Illegal Financial Arrangements**

66.     Upon information and belief, in order to obtain access to Insureds so the Defendants could implement and execute their fraudulent schemes and maximize the amount of

No-Fault Benefits the Supplier Defendants could obtain from GEICO and other New York automobile insurers, the Defendants and other healthcare providers – either directly or through third parties who are not presently identifiable – entered into illegal agreements where prescriptions for Fraudulent Equipment were provided to the Supplier Defendants in exchange for financial consideration.

67.     Upon information and belief, since at least 2019, the Supplier Defendants engaged in unlawful financial arrangements with the Referral Defendants and other healthcare providers – either directly or through third parties who are not presently identifiable – in order to obtain prescriptions for Fraudulent Equipment. These schemes allowed the Supplier Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

68.     Upon information and belief, pursuant to the unlawful financial arrangements, the Supplier Defendants would pay kickbacks either to the Referral Defendants, the Clinics, or to other entities, such as fictitious businesses, in order to obtain referrals for Fraudulent Equipment to provide to motor vehicle accident victims.

69.     In support of the fact that the unlawful financial arrangements between the Supplier Defendants, the Referral Defendants, other health care providers, and others who are presently not known involved payment of illegal kickbacks through other entities, on or about May 24, 2019, the Supplier Defendants used a check to pay $10,675.23 to Statewide Employment Professionals, Inc. ("Statewide Employment") for no legitimate purpose.

70.     In further support of the fact that the payment made to Statewide Employment was for no legitimate purpose, Abayev is Big Apple's sole employee.

71.     Additionally, and in further support that the Supplier Defendants paid kickbacks in order to obtain prescriptions for Fraudulent Equipment, Big Apple paid $9,632.38 to Prompt Process Serving & Investigation Inc. ("Prompt Process") through a check dated May 28, 2019, when, upon information and belief, Prompt Process does not serve any legal papers on Big Apple's behalf. In support of the fact that Prompt Process is not a legitimate process serving organization, Prompt Process is not licensed by the New York City Department of Consumer Affairs as a process serving agency.

72.     Furthermore, and in keeping with the fact that Big Apple paid illegal kickbacks in order to obtain the prescriptions for Fraudulent Equipment, Big Apple provided multiple checks to Med Supply Professionals, Inc. ("Med Supply") within a short period of time when Med Supply does not conduct any legitimate business activity. For example, the following checks were issued to Med Supply in a two-month period of time:

>   (i)     On May 7, 2019, Big Apple issued check #1003 to Med Supply in the amount of $10,472.14;
>
>   (ii)    On June 3, 2019, Big Apple issued check #1032 to Med Supply in the amount of $9,875.00;
>
>   (iii)   On June 11, 2019, Big Apple issued check #1043 to Med Supply in the amount of $9,425.13; and
>
>   (iv)    On July 2, 2019, Big Apple issued check #1061 to Med Supply in the amount of $17,266.40.

73.     Upon information and belief, the above-mentioned payments by Big Apple were issued solely in support of the unlawful financial arrangements between the Supplier Defendants, the Referral Defendants, and other healthcare providers – through third-parties – in order to obtain prescriptions for Fraudulent Equipment.

74.     Additionally, and in keeping with the fact that Big Apple paid illegal kickbacks in order to obtain the prescriptions for Fraudulent Equipment, Big Apple provided multiple checks

to NY & EU Supply, Inc. ("NY & EU Supply") within a short period of time when NY & EU Supply does not conduct any legitimate business activity. For example, the following checks were issued to NY & EU Supply in a two-month period of time:

    (i)    On May 2, 2019, Big Apple issued check #1002 to NY & EU Supply in the amount of $12,832.00;

    (ii)    On June 3, 2019, Big Apple issued check #1031 to NY & EU Supply in the amount of $12,474.56;

    (iii)    On June 10, 2019, Big Apple issued check #1041 to NY & EU Supply in the amount of $10,765.15;

    (iv)    On July 3, 2019, Big Apple issued check #1060 to NY & EU Supply in the amount of $13,528.10; and

    (v)    On July 8, 2019, Big Apple issued check #1070 to NY & EU Supply in the amount of $13,484.16.

75.    In keeping with the fact that NY & EU Supply is not a legitimate supply company, NY & EU Supply is not licensed as DME supplier with the New York City Department of Consumer Affairs.

76.    Upon information and belief, the above-mentioned payments by Big Apple were issued solely in support of the unlawful financial arrangements between the Supplier Defendants, the Referral Defendants, and other healthcare providers – through third-parties – in order to obtain prescriptions for Fraudulent Equipment.

77.    Upon information and belief, the above-mentioned payments are only a fraction of the monies paid by Big Apple in support of the unlawful financial arrangements between the Supplier Defendants, the Referral Defendants, and other healthcare providers – through third-parties – in order to obtain prescriptions for Fraudulent Equipment.

78.    In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Supplier Defendants and healthcare

providers, including the Referral Defendants, Abayev never met the healthcare providers who issued prescriptions that were provided to the Supplier Defendants. Instead, the prescriptions for the Fraudulent Equipment were procured by Abayev as a result of arrangements that were facilitated by third-parties associated with the healthcare providers at the Clinics.

79.     In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants – either directly or through third parties not presently identifiable – the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined treatment protocol.

80.     As explained in more detail below, the Supplier Defendants received prescriptions from various healthcare providers that practiced at Clinics across the New York metropolitan area for a few predetermined types of high-value Fraudulent Equipment, which were not medically necessary.

81.     In also keeping with the fact that the Supplier Defendants obtained prescriptions for Fraudulent Equipment as a result of unlawful financial arrangements, the Supplier Defendants would obtain prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

82.     Upon information and belief, and in keeping with the fact that the prescriptions for Fraudulent Equipment were obtained directly from the Clinics and without any involvement by the Insureds, the prescriptions issued by the Referral Defendants and other healthcare providers were provided directly to the Clinics' receptionists who then submitted the prescriptions directly to the Supplier Defendants.

83.     Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, in many cases, the Insureds were provided with Fraudulent Equipment directly from the Clinics' without any interaction with the Supplier Defendants.

84.     In further support that the Fraudulent Equipment was provided without any interaction by the Supplier Defendants, statements provided to GEICO by Insureds confirmed that when Insureds were actually provided with Fraudulent Equipment, they received it directly from one of the Clinics, typically from the receptionists, without any involvement from the Supplier Defendants, and never received prescriptions for Fraudulent Equipment from a healthcare provider.

85.     For example:

(i)     On February 9, 2019, an Insured named DT was purportedly injured in a motor vehicle accident. Thereafter, DT received treatment at a multi-disciplinary clinic located in Ozone Park, New York. During an interview with a GEICO investigator, DT confirmed that: (i) DT received Fraudulent Equipment from the receptionist at the multi-disciplinary clinic located in Ozone Park, New York; (ii) DT was not measured for the Fraudulent Equipment; and (iii) no one instructed DT on how to use the Fraudulent Equipment.

(ii)    On March 30, 2019, an Insured named RD was purportedly injured in a motor vehicle accident. Thereafter, RD received treatment at a multidisciplinary clinic located on Grand Concourse in Bronx, New York. During an interview with a GEICO investigator, RD confirmed that: (i) RD received Fraudulent Equipment from a receptionist at the multi-disciplinary clinic located on Grand Concourse, Bronx, New York; and (ii) no one instructed RD on how to use the Fraudulent Equipment.

(iii)   On March 15, 2019, an Insured named JJ was purportedly injured in a motor vehicle accident. Thereafter, JJ received treatment at the Jerome Avenue Clinic. During an interview with a GEICO investigator, JJ confirmed that: (i) JJ received Fraudulent Equipment from the receptionist at the Jerome Avenue Clinic; (ii) no one instructed JJ how to use the Fraudulent Equipment; and (iii) JJ was not measured for the Fraudulent Equipment.

(iv)    On March 17, 2019, an Insured named JL was purportedly injured in a motor vehicle accident. Thereafter, JL received treatment at a multi-

disciplinary clinic located on Southern Boulevard in Bronx, New York. During an interview with a GEICO investigator, JL confirmed that: (i) JL received Fraudulent Equipment in a garbage bag from a multi-disciplinary clinic located on Southern Boulevard, Bronx, New York; (ii) no one instructed JL how to use the Fraudulent Equipment; and (iii) JL was not measured for the Fraudulent Equipment.

(v)     On September 3, 2019, an Insured named SH was purportedly injured in a motor vehicle accident. Thereafter, SH received treatment at a multi-disciplinary clinic located on Louis Nine Boulevard, Bronx, New York. During an interview with a GEICO investigator, SH confirmed that SH received Fraudulent Equipment from someone at the multi-disciplinary clinic located on Louis Nine Boulevard, Bronx, New York.

86.     These are only representative examples. In virtually all the claims for Fraudulent Equipment identified in Exhibit "1", to the extent that the Insureds were actually provided with Fraudulent Equipment, the Insureds received the Fraudulent Equipment directly from the Clinics without any involvement from the Supplier Defendants.

87.     Upon information and belief, the Referral Defendants were knowingly involved in the Supplier Defendants unlawful financial arrangement schemes – either directly or through third-parties who are presently unidentifiable – by: (i) issuing prescriptions for Fraudulent Equipment that they knew were submitted to and billed by the Supplier Defendants as part of a scheme to defraud GEICO; or (ii) knowingly providing their license for others to issue prescriptions for Fraudulent Equipment that they knew were submitted to and billed by the Supplier Defendants as part of a scheme to defraud GEICO.

88.     In keeping with the fact that the Referral Defendants were knowingly involved in the Supplier Defendants unlawful financial arrangement schemes, a frequent amount of the prescriptions for Fraudulent Equipment that were purportedly provided to the Supplier Defendants contained healthcare providers' signatures that were photocopied, including Kiaei and Margulies.

89.     Upon information and belief, Kiaei and Margulies knowingly allowed their signatures to be photocopied and these photocopies be given to laypersons that would unlawfully issue prescriptions for Fraudulent Equipment that were directly provided to the Supplier Defendants.

90.     In all of the claims identified in Exhibits "1", the Supplier Defendants falsely represented that Fraudulent Equipment were provided pursuant to lawful prescriptions from healthcare providers, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

C.      **The Defendants' Fraudulent Prescription-Issuing Protocol**

91.     In addition to the unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants the prescriptions provided to the Supplier Defendants were issued pursuant to predetermined fraudulent protocols that were designed to maximize the billing that the Supplier Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

92.     In the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

93.     Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referral Defendants and other healthcare providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

94.     In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor

accidently, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

95.    To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

96.    However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the healthcare providers that referred patients to the Supplier Defendants – including the Referral Defendants – were subject to extremely similar treatment including nearly identical prescriptions for Fraudulent Equipment.

97.    The Referral Defendants and other healthcare providers issued prescriptions for Fraudulent Equipment to Insureds pursuant to predetermined fraudulent protocols without regard for the Insureds' individual symptoms or presentation.

98.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit the fraudulent protocols described below to proceed under his, her, or its auspices.

99.    The healthcare providers, including the Referral Defendants, permitted the predetermined fraudulent protocols described below, which were not medically necessary, to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other New York automobile insurers.

100.    Overall, the predetermined fraudulent protocols executed by the healthcare providers that purportedly treated Insureds, including the Referral Defendants, had a similar pattern for an overwhelming majority of the Insureds associated with the claims identified in Exhibit "1", and was typically as follows:

- the Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

- the Insured would be seen either by a physician, chiropractor, physician's assistant, or nurse practitioner;

- on the date of the first visit, the healthcare provider would direct the Insured to undergo conservative treatment and oftentimes provide a prescription for a predetermined set of DME and/or OD;

- subsequently, the Insured would return to the Clinic for one or more additional evaluations and would be provided with an additional, and occasionally more than one, prescription for a predetermined set of DME and/or OD;

- at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Supplier Defendants to fill and was without any involvement by the Insured.

101.    An overwhelming majority of the claims identified in Exhibit "1" are based upon medically unnecessary prescriptions for virtually identical Fraudulent Equipment, which were provided to the Supplier Defendants from various healthcare providers that practiced at Clinics across the New York metropolitan area.

102.    In keeping with the fact that the prescriptions provided to the Supplier Defendants were – not based on medical necessity but – part of a predetermined fraudulent protocol, an overwhelming majority of the Insureds identified in Exhibit "1" that were prescribed Fraudulent Equipment after purportedly undergoing follow-up examinations were issued prescriptions for virtually identical Fraudulent Equipment, regardless which healthcare provider and Clinic purportedly treated the Insureds.

103.    In keeping with the fact that the prescriptions were provided – not based on medical necessity but – as part of a predetermined fraudulent protocol, the prescriptions received by the Supplier Defendants after Insureds' purported follow-up examinations virtually always included at least one, but frequently both, of the following Fraudulent Equipment: (i) a LSO; and (ii) a cervical traction unit. These "follow-up examination prescriptions" were virtually identical regardless which healthcare provider, including the Referral Defendants, issued the prescription.

104.    In further keeping with the fact that the prescriptions provided to the Supplier Defendants were – not based on medical necessity but – part of a predetermined fraudulent protocol, an overwhelming majority of the Insureds identified in Exhibit "1" would receive the typical "follow-up examination prescription" regardless which healthcare provider issued the prescription.

105.    Upon information and belief, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols – and not based upon medical necessity – the prescriptions issued by the Referral Defendants and the other healthcare providers were never given to the Insureds but were routed directly to the Supplier Defendants.

106.    Upon information and belief, in an overwhelming majority of cases, to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from receptionists at the healthcare providers' offices, without any interaction from the Supplier Defendants.

107.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the

treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

108.    Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider <u>may</u> – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

109.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

110.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

111.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

112.    It is extremely improbable – to the point of impossibility – that an overwhelming majority of the Insureds identified in Exhibit "1" – who treated with one of many healthcare providers, including the Referral Defendants, at different Clinics around the New York metropolitan area – would ultimately receive the same preset prescriptions for the same items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

113.    A substantial number of Insureds receiving virtually identical prescriptions for two items of Fraudulent Equipment would, by extension, mean that all those Insureds – who reported to one of many healthcare providers across the New York metropolitan area – complained of identical symptoms and exhibited identical weaknesses in their physical conditions.

114.    In actuality, the Insureds identified in Exhibit "1" who were provided the preset prescriptions of Fraudulent Equipment were provided with the preset prescription based solely upon whether the Insured visited the prescribing healthcare provider for a follow-up examination.

115.    In further keeping with the fact that the Referral Defendants and other healthcare providers prescribed Fraudulent Equipment purportedly provided by the Supplier Defendants pursuant to predetermined fraudulent protocols – and not based upon medical necessity – each healthcare provider who provided prescriptions to the Supplier Defendants issued virtually identical prescriptions for Fraudulent Equipment to virtually every patient, which were then provided to the Supplier Defendants.

116.    In further keeping with the fact that Fraudulent Equipment were prescribed pursuant to predetermined fraudulent protocols – and not based upon medical necessity – the specific Fraudulent Equipment contained on the prescriptions usually contravened the Insureds' conservative treatment plans.

117.    For example, and as indicated below, virtually every Insured identified in Exhibit "1" were provided with at least one prescription for DME/OD that included an immobilizing LSO. By contrast, the Insureds were also prescribed physical therapy treatments which called for bending and stretching to strengthen weakened parts of the body.

118.   The purportedly prescribed immobilizing device completely contravene the mobilizing physical therapy treatments that the Insureds were also prescribed. In the context of treatment for injuries related to minor and low-impact motor vehicle accidents, no legitimate physician, chiropractor, or other licensed healthcare provider acting in each pa1ient's best interest would prescribe both mobilizing physical therapy and immobilizing devices at the same time.

1)     **The Predetermined Fraudulent Protocol involving Mostovoy at the Hempstead Avenue Clinic**

119.   Mostovoy, either directly or with the assistance of third-party individuals presently unidentifiable, agreed to participate in a predetermined fraudulent protocol and unlawful financial arrangement with the Supplier Defendants where they provided the Insureds that treated at the Hempstead Avenue Clinic with prescriptions for a predetermined set of Fraudulent Equipment.

120.   Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who purportedly received treatment at the Hempstead Avenue Clinic were purportedly provided with chiropractic treatment from Mostovoy. Subsequent to their purported follow-up examinations, each of the Insureds were prescribed at least one, but oftentimes two items of Fraudulent Equipment.

121.   In support of the fact that the prescriptions for Fraudulent Equipment were medically unnecessary and provided pursuant to predetermined fraudulent protocol, Mostovoy provided prescriptions for the Fraudulent Equipment after the Insureds follow-up examinations.

122.   When the Insureds sought treatment at the Hempstead Avenue Clinic and were purportedly provided with an evaluation by Mostovoy, Mostovoy did not evaluate each Insured's

30

individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

123.    Rather, Mostovoy, prescribed a predetermined set of Fraudulent Equipment to each Insured after a purported follow-up examination based upon the fraudulent protocol established with the Supplier Defendants.

124.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported follow-up examination, Mostovoy, virtually always prescribed at least one, and often both, of the following Fraudulent Equipment to every Insured identified in Exhibit "1" that he treated: (i) cervical traction unit; and/or (ii) "LSO w/ APL Control fitted and Adjusted" [sic].

125.    To the extent that only one item of Fraudulent Equipment described above was prescribed by Mostovoy to an Insured after a purported follow-up examination, if the Insured continued treating at the Hempstead Avenue Clinic, Mostovoy virtually always prescribed the second item of Fraudulent Equipment after a subsequent purported follow-up examination.

126.    For example:

(i)    On January 13, 2019, a patient named AS was purportedly involved in a motor vehicle accident. AS purportedly started treating at the Hempstead Avenue Clinic on or around January 16, 2019. After Mostovoy purportedly performed a follow-up examination on AS on February 7, 2019, Mostovoy issued a prescription in the name of AS for a cervical traction unit that was provided to the Supplier Defendants. After a subsequent follow-up examination on February 25, 2019, Mostovoy issued a prescription in the name of AS for a "LSO w/ APL Control" that was provided to the Supplier Defendants.

(ii)    On April 8, 2019, a patient named GP was purportedly involved in a motor vehicle accident. GP purportedly started treating at the Hempstead Avenue Clinic on or around April 10, 2019. After Mostovoy purportedly performed a follow-up examination on GP on June 10, 2019, Mostovoy

issued a prescription in the name of GP that was provided to the Supplier
Defendants for the following Fraudulent Equipment: (i) a cervical traction
unit; and (ii) "LSO w/ APL Control".

(iii)     On May 11, 2019, a patient named YD was purportedly involved in a
motor vehicle accident. YD purportedly started treating at the Hempstead
Avenue Clinic on or around May 17, 2019. After Mostovoy purportedly
performed a follow-up examination on YD on June 12, 2019, Mostovoy
issued a prescription in the name of YD for a cervical traction unit that
was provided to the Supplier Defendants. After a subsequent follow-up
examination on August 13, 2019, Mostovoy issued a prescription in the
name of YD for a "LSO w/ APL Control" that was provided to the
Supplier Defendants.

(iv)     On June 3, 2019, a patient named SB was purportedly involved in a motor
vehicle accident. SB purportedly started treating at the Hempstead Avenue
Clinic on or around June 5, 2019. After Mostovoy purportedly performed
a follow-up examination on SB on June 28, 2019, Mostovoy issued a
prescription in the name of SB for a cervical traction unit that was
provided to the Supplier Defendants. After a subsequent follow-up
examination on July 8, 2019, Mostovoy issued a prescription in the name
of SB for a "LSO w/ APL Control" that was provided to the Supplier
Defendants.

(v)     On September 11, 2019, a patient named VJ was purportedly involved in a
motor vehicle accident. VJ purportedly started treating at the Hempstead
Avenue Clinic on or around September 16, 2019. After Mostovoy
purportedly performed a follow-up examination on VJ on October 14,
2019, Mostovoy issued a prescription in the name of VJ that was provided
to the Supplier Defendants for the following Fraudulent Equipment: (i) a
cervical traction unit; and (ii) a "LSO w/ APL Control".

127.     These are only representative samples. In fact, virtually all of the Insureds

identified in Exhibit "1" that received treatment at the Hempstead Avenue Clinic from

Mostovoy, and then returned for follow-up examinations were then provided with virtually

identical prescriptions for the following Fraudulent Equipment: (i) cervical traction unit; and (ii)

"LSO w/ APL Control".

128.     In keeping with the fact that the prescriptions issued to the Insureds identified in

Exhibit "1" by Mostovoy were not medically necessary and were provided pursuant to the

predetermined fraudulent protocol, Mostovoy's examination reports, which were purportedly written on the same date as the prescription for Fraudulent Equipment, did not appropriately describe the prescribed Fraudulent Equipment.

129.   In a legitimate setting, when a patient is prescribed DME and/or OD by a healthcare provider, the healthcare provider would indicate in a contemporaneous evaluation report what specific DME and/or OD was prescribed and why. Such information is typically included in a contemporaneous report so the healthcare provider can recall what he or she previously prescribed and provide proper follow-up questions during a subsequent evaluation.

130.   In keeping with the fact that the prescriptions for Fraudulent Equipment provided after purported follow-up examinations at the Hempstead Avenue Clinic were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports did not contain any sufficient information to explain why Mostovoy prescribed any of the Fraudulent Equipment.

131.   For example, Mostovoy's follow-up examination reports for the Insureds identified in Exhibit "1" virtually never included an explanation – let alone a legitimate medical reason – for prescribing the Fraudulent Equipment or how it could aid in treating the Insured's symptoms. In fact, virtually none of the follow-up examination reports indicated that Mostovoy was prescribing the contemporaneously written prescriptions for Fraudulent Equipment.

132.   In keeping with the fact that Mostovoy's examination reports failed to mention the prescribed Fraudulent Equipment, Mostovoy's checklist and fill-in the blank evaluation reports, despite having a section for notes, did not indicate what equipment was to be provided or an explanation for prescribing any of the Fraudulent Equipment.

133.    In  further keeping with the fact that the prescriptions for Fraudulent Equipment by Mostovoy at the Hempstead Avenue Clinic were not medically necessary and were part of the fraudulent scheme, virtually all of the prescriptions for cervical traction units and lumbar support braces routinely contravened the Insureds' conservative treatment plans.

134.    For example, Mostovoy systemically prescribed cervical traction units and lumbar support braces which immobilize the patient while at the same time the Insureds were undergoing physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including the spine. In this context, the prescriptions for cervical traction units and lumbar support braces completely contravened the mobilizing physical therapy treatments. No legitimate treatment regimen would involve the prescription immobilizing devices while the patient was also undergoing mobilizing physical therapy.

135.    Additionally, as part of the fraudulent scheme, the prescriptions issued by Mostovoy at the Hempstead Avenue Clinic were never given to the Insureds but were routed directly to the Supplier Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Hempstead Avenue Clinic, without any interaction with or instruction concerning their use from either the Supplier Defendants or a healthcare provider.

                    **2)       The Predetermined Fraudulent Protocol Involving Paulus at the
                              Jerome Avenue Clinic**

136.    Similar to the scheme at the Hempstead Avenue Clinic, Paulus, either directly or through the aid of third-party individuals who are not presently known, agreed to participate in a predetermined fraudulent protocol, as a result of an unlawful financial arrangement, with the

Supplier Defendants where he provided the Insureds that treated at the Jerome Avenue Clinic with prescriptions for a predetermined set of Fraudulent Equipment.

137.    Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who treated with Metro Pain providers at the Jerome Avenue Clinic, including Paulus, were purportedly provided with initial examinations.

138.    When the Insureds identified in Exhibit "1" sought treatment with and were purportedly evaluated by the healthcare providers at Metro Pain, including Paulus, they did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

139.    Rather, the healthcare providers at Metro Pain, including Paulus, prescribed each of the Insureds identified in Exhibit "1" with a preset prescription for multiple items of DME and/or OD that was provided to a different DME/OD provider.

140.    In keeping with the fact that Paulus issued prescriptions for DME and/or OD pursuant to predetermined fraudulent protocols, virtually every Insured who underwent an initial examination by Paulus received a prescription for virtually the same type of DME and OD Equipment that was provided to a different DME/OD provider.

141.    Thereafter, and pursuant to the predetermined fraudulent protocol with the Supplier Defendants, the Insureds would virtually always be provided two additional prescriptions for virtually identical Fraudulent Equipment which were provided to the Supplier Defendants.

142.    In keeping with the fact that the prescriptions by Paulus to the Insureds identified in Exhibit "1" for were for medically unnecessary Fraudulent Equipment that were provided

pursuant to a predetermined fraudulent protocol, an overwhelming majority all of the prescriptions provided to the Supplier Defendants that were purportedly issued by Paulus were issued on dates when Paulus did not provide a follow-up examination or other healthcare service.

143.   To the extent that the prescriptions by Paulus for Fraudulent Equipment to the Insureds identified in Exhibit "1" were issued on a date where Paulus provided a follow-up examination or other healthcare service, the Fraudulent Equipment was still provided pursuant to a predetermined fraudulent protocol as Paulus never indicated in any examination report or other medical record that he was issuing the Fraudulent Equipment to the Insureds.

144.   Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, Paulus virtually always prescribed to every Insured identified in Exhibit "1" that he treated with: (i) a cervical posture pump; and (ii) a "LSO W/APL Control Custom".

145.   For example:

(i)      On February 25, 2019, a patient named NR was purportedly involved in a motor vehicle accident. NR purportedly started treating with Metro Pain at the Jerome Avenue Clinic on March 7, 2019. On April 10, 2019, Paulus issued a prescription in the name of NR that was provided to the Supplier Defendants for: (i) a cervical posture pump; and (ii) a "LSO W/APL Control Custom" despite Paulus not performing a follow-up examination or any other service on NR on that day.

(ii)     On March 6, 2019, a patient named GF was purportedly involved in a motor vehicle accident. GF purportedly started treating with Metro Pain at the Jerome Avenue Clinic on May 3, 2019. However, on May 3, 2019, Paulus issued a prescription in the name of GF that was provided to the Supplier Defendants for: (i) a cervical posture pump; and (ii) a "LSO W/APL Control Custom" despite Paulus not performing a follow-up examination or any other service on GF on that day.

(iii)    On May 19, 2019, a patient named JH was purportedly involved in a motor vehicle accident. JH purportedly started treating with Metro Pain at the Jerome Avenue Clinic on June 5, 2019.  On June 28, 2019, Paulus

issued a prescription in the name of JH that was provided to the Supplier Defendants for: (i) a cervical posture pump; and (ii) a "LSO W/APL Control Custom" despite Paulus not performing a follow-up examination or any other service on JH on that day.

(iv)     On June 16, 2019, a patient named DM was purportedly involved in a motor vehicle accident. DM purportedly started treating with Metro Pain at the Jerome Avenue Clinic on July 3, 2019. On August 1, 2019, Paulus issued a prescription in the name of DM that was provided to the Supplier Defendants for: (i) a cervical posture pump; and (ii) a "LSO W/APL Control Custom" despite Paulus not performing a follow-up examination or any other service on DM on that day.

(v)     On July 20, 2019, a patient named IG was purportedly involved in a motor vehicle accident. IG purportedly started treating with Metro Pain at the Jerome Avenue Clinic on July 31, 2019. On September 6, 2019, Paulus issued a prescription in the name of IG that was provided to the Supplier Defendants for: (i) a cervical posture pump; and (ii) a "LSO W/APL Control Custom" despite Paulus not performing a follow-up examination or any other service on IG on that day.

146.     These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that treated with Metro Pain at the Jerome Avenue Clinic were issued prescriptions by Paulus for both (i) a cervical posture pump, and (ii) a "LSO W/APL Control Custom" when Paulus did not perform a follow-up examination or any other service on the day that the prescriptions were issued.

147.     In keeping with the fact that the prescriptions by Paulus to the Insureds for Fraudulent Equipment were not medically necessary and were part of a predetermined fraudulent protocol, Paulus's examination reports and other medical records never contained any information sufficient to identify the Fraudulent Equipment being prescribed or explain why Paulus prescribed the Fraudulent Equipment.

148.     In keeping with the fact that the prescriptions provided by Paulus for the Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the follow-up examination reports both before and after the

prescriptions for Fraudulent Equipment were issued never identified or explained why Paulus prescribed the Fraudulent Equipment.

149.    Even more, the follow-up examination reports never discussed or otherwise referenced the DME and/or OD previously prescribed to the Insureds by Paulus after their initial examinations.

150.    In further keeping with the facts that the prescriptions for Fraudulent Equipment provided to the Insureds identified in Exhibit "1" were medically unnecessary and provided pursuant to a predetermined fraudulent protocol, Paulus never indicated, in any report, why the Insureds identified in Exhibit "1" were prescribed a "LSO W/APL Control Custom" when the Insureds were previously prescribed a substantially similar lumbar sacral orthotic after the Insureds initial examinations.

151.    Upon information and belief, the only difference between the lumbar sacral orthotic that the Insureds purportedly received after their initial examinations with Paulus and the "LSO W/APL Control Custom" purportedly provided by the Supplier Defendants pursuant to Paulus's prescriptions was a slightly larger back panel and an additional panels that provides support to the sides of the lower back.

152.    In a legitimate setting, when a healthcare provider would issue a prescription for DME and/or OD, the healthcare provider would indicate on a contemporaneously written report that a specific item of DME and/or OD would be prescribed and the indicate a reason for prescribing the DME and/or OD.

153.    Even more so, and again in a legitimate setting, when a healthcare provider issues a prescription for an item that is substantially similar to a previously prescribed item there would

be a contemporaneously written report or note indicating what was previously prescribed and why that new substantially similar item was medically necessary.

154.    However, virtually none of the reports by Paulus ever indicated that a "LSO W/APL Control Custom" was prescribed or indicated why it was prescribed when a substantially similar item was provided after the Insureds' initial examination reports.

155.    In further keeping with the fact that the prescriptions for Fraudulent Equipment by Paulus were pursuant to a predetermined fraudulent protocol, Paulus virtually always issued multiple separate prescriptions on a single date for an individual Insured in order to provide the Supplier Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to avoid detection of their fraudulent schemes.

156.    In keeping with the fact that Paulus issued multiple prescriptions to Insureds on a single date to further the fraudulent scheme, the multiple prescriptions for Fraudulent Equipment were on a pre-printed prescription form that required Paulus to checkmark the DME and/or OD he wanted to prescribe and could have easily been provided on a single pre-printed prescription form.

157.    There is no legitimate reason why any healthcare provider would need to issue multiple prescriptions to an individual Insured on a single date that was filled by a single DME/OD retailer, including the Supplier Defendants. Even more, there is no legitimate reason why this would occur in a substantial amount of the Insureds identified in Exhibit "1" who treated with Paulus at the Jerome Avenue Clinic.

158.    In further keeping with the fact that each prescription for Fraudulent Equipment issued from a healthcare provider at the Jerome Avenue Clinic was not medically necessary and was part of the fraudulent scheme, virtually all of the prescriptions for cervical traction pumps

and lumbar support braces routinely contravened the Insureds' conservative treatment plans. For example, Paulus systemically prescribed cervical traction pumps and lumbar supports, which immobilize the patient, while directing the Insureds to also undergo active mobilizing physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including the spine. In this context, the prescriptions for cervical traction pumps and lumbar support braces completely contravened the active mobilizing physical therapy treatments also prescribed by the same healthcare provider. No legitimate treatment regimen would involve the simultaneous prescription of active mobilizing physical therapy and immobilizing devices.

159.    Additionally, as part of the fraudulent scheme, the prescriptions issued by Paulus were never given to the Insureds but were routed directly to the Supplier Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Jerome Avenue Clinic, without any interaction with or instruction concerning their use from either the Supplier Defendants or a healthcare provider.

### 3)    The Predetermined Fraudulent Protocol involving Kiaei at the Seneca Avenue Clinic

160.    Kiaei, either directly or with the assistance of third-party individuals not presently known, agreed to participate in a predetermined fraudulent protocol and unlawful financial arrangement, with the Supplier Defendants where they provided the Insureds that treated at the Seneca Avenue Clinic with prescriptions for a predetermined set of Fraudulent Equipment.

161.    Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who purportedly received treatment at the Seneca Avenue Clinic were purportedly provided with chiropractic treatment

from Kiaei. Subsequent to their purported follow-up examinations, each of the Insureds were prescribed at least one, oftentimes two items of Fraudulent Equipment.

162.    When the Insureds sought treatment at the Seneca Avenue Clinic and were purportedly evaluated by Kiaei, Kiaei did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

163.    Rather, Kiaei, prescribed a predetermined set of treatment to each Insured, which included prescriptions for Fraudulent Equipment based upon the fraudulent protocol established with the Supplier Defendants.

164.    In keeping with the fact that the prescriptions for Fraudulent Equipment were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, many of these purported prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued on dates when Kiaei did not provide a follow-up examination or other healthcare service to those Insureds.

165.    To the extent that the prescriptions by Kiaei for Fraudulent Equipment to the Insureds identified in Exhibit "1" were for issued on a date where Kiaei provided a follow-up examination or other healthcare service, the Fraudulent Equipment was still provided pursuant to a predetermined fraudulent protocol as Kiaei never indicated in any examination report or other medical record that she was issuing the Fraudulent Equipment to the Insureds.

166.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after undergoing treatment with Kiaei, Kiaei virtually always prescribed at least one, but oftentimes both of the following Fraudulent Equipment to

every Insured identified in Exhibit "1" that she treated: (i) a "cervical traction w/ pump"; and (ii)

a lumbar sacral orthosis.

167.    For example:

(i)     On October 11, 2018, a patient named KK was purportedly involved in a motor vehicle accident. KK purportedly started treating at the Seneca Avenue Clinic on or around November 14, 2018. On January 11, 2019, Kiaei issued a prescription in the name of KK that was provided to the Supplier Defendants for a "cervical traction w/ pump" despite Kiaei not performing a follow-up examination or any other service on KK on that day.  On January 31, 2019, Kiaei issued a prescription in the name of KK that was provided to the Supplier Defendants for a lumbar sacral orthosis despite Kiaei not performing a follow-up examination or any other service on KK on that day.

(ii)    On October 17, 2018, a patient named RL was purportedly involved in a motor vehicle accident. RL purportedly started treating at the Seneca Avenue Clinic on or around November 6, 2018. On January 11, 2019, Kiaei issued a prescription in the name of RL that was provided to the Supplier Defendants for: (i) "cervical traction w/ pump"; and (ii) a lumbar sacral orthosis despite Kiaei not performing a follow-up examination or any other service on RL on that day.

(iii)   On January 4, 2019, a patient named MG was purportedly involved in a motor vehicle accident. MG purportedly started treating at the Seneca Avenue Clinic on or around February 20, 2019. On April 5, 2019, after a purported follow-up examination at the Seneca Avenue Clinic, Kiaei issued a prescription in the name of MG that was provided to the Supplier Defendants for: (i) "cervical traction w/ pump"; and (ii) a lumbar sacral orthosis.

(iv)    On February 5, 2019, a patient named GA was purportedly involved in a motor vehicle accident. GA purportedly started treating at the Seneca Avenue Clinic on or around February 6, 2019. On March 15, 2019, Kiaei issued a prescription in the name of GA that was provided to the Supplier Defendants for: (i) "cervical traction w/ pump"; and (ii) a lumbar sacral orthosis despite Kiaei not performing a follow-up examination or any other service on GA on that day.

(v)     On May 3, 2019, a patient named CV was purportedly involved in a motor vehicle accident. CV purportedly started treating at the Seneca Avenue Clinic on or around May 14, 2019. On June 14, 2019, after a purported follow-up examination at the Seneca Avenue Clinic, Kiaei issued a prescription in the name of CV that was provided to the Supplier

Defendants for a "cervical traction w/ pump". On July 8, 2019, after a purported follow-up examination at the Seneca Avenue Clinic, Kiaei issued a prescription in the name of CV that was provided to the Suppler Defendants for a lumbar sacral orthosis.

168.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received treatment at the Seneca Avenue Clinic from Kiaei were provided with virtually identical prescriptions for the at least one, but oftentimes both of the following Fraudulent Equipment: (i) a "cervical traction w/ pump"; and (ii) a lumbar sacral orthosis, regardless whether Kiaei performed an examination or other healthcare service on the Insureds on the same day.

169.    In keeping with the fact that the prescriptions for Fraudulent Equipment issued at the Seneca Avenue Clinic by Kiaei were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, to the extent that Kiaei drafted a contemporaneously written examination report or progress note, such records did not identify or describe in any way the prescribed Fraudulent Equipment.

170.    In a legitimate setting, when a patient is prescribed DME and/or OD by a healthcare provider, the healthcare provider would indicate in a contemporaneous evaluation report what specific DME and/or OD was prescribed and why.  Such information is typically included in a contemporaneous report so the healthcare provider can recall what he or she previously prescribed and provide proper follow-up questions during a subsequent evaluation.

171.    In keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and provided pursuant to a predetermined fraudulent protocol, to the extent that there were contemporaneous reports, the contemporaneous reports did not contain any sufficient information to explain why Kiaei prescribed any of the Fraudulent Equipment.

172. To the extent that the prescriptions for the Fraudulent Equipment were written on a day where Kiaei did not perform an examination or other healthcare service, the examination reports both before and after the prescriptions for Fraudulent Equipment were issued never identified or explained why Kiaei prescribed the Fraudulent Equipment.

173. In fact, none of Kiaei's records ever identified or explained why the Insureds identified in Exhibit "1" were prescribed Fraudulent Equipment purportedly provided by the Supplier Defendants.

174. In a legitimate setting, when a patient returns for a subsequent follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

175. However, Kiaei's follow-up examination reports failed to include any meaningful information – let alone any information – regarding Fraudulent Equipment prescribed to the Insureds on a prior date.

176. In keeping with the fact that each prescription for Fraudulent Equipment issued by Kiaei at the Seneca Avenue Clinic was not medically necessary and was part of the fraudulent scheme, virtually all of the prescriptions for cervical traction units and lumbar support braces routinely contravened the Insureds' conservative treatment plans.

177. For example, Kiaei systemically prescribed cervical traction units and lumbar support braces which immobilize the patient while at the same time the Insureds were

undergoing physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including the spine.

178.    In this context, the prescriptions for cervical traction units and lumbar support braces completely contravened the mobilizing physical therapy treatments. No legitimate treatment regimen would involve the prescription immobilizing devices while the patient was also undergoing mobilizing physical therapy.

179.    Furthermore, and in keeping with the fact that the prescriptions issued by Kiaei to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, many of the prescriptions issued by Kiaei were contained photocopied signatures.

180.    As part of the fraudulent scheme, Kiaei, or someone else at Kiaei's direction, used previously signed prescriptions from a particular date that were then duplicated and modified to include the patients' name, while the date of the prescription and Kiaei's signature remained the same.

181.    For example, a significant majority of the claims for Fraudulent Equipment identified in Exhibit "1" from Kiaei were based upon unlawfully duplicated prescription forms that were previously filled out and signed. Thereafter, the unlawfully duplicated prescription forms would be sent to the Supplier Defendants, pursuant to the predetermined fraudulent protocol, and used as the basis to submit fraudulent charges identified in Exhibit "1".

182.    No legitimate physician, chiropractor, other licensed healthcare provider would provide or permit a prescription form containing a signature to be photocopied and used as the basis for providing a prescription to another patient.

183.    Additionally, as part of the fraudulent scheme, the prescriptions issued by Kiaei at the Seneca Avenue Clinic were never given to the Insureds but were routed directly to the Supplier Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Seneca Avenue Clinic, without any interaction with or instruction concerning their use from either the Supplier Defendants or a healthcare provider.

### 4)    The Predetermined Fraudulent Protocol involving Margulies at the Hempstead Turnpike Clinic

184.    Margulies, either directly or with the assistance of third-party individuals not presently known, agreed to participate in a predetermined fraudulent protocol and unlawful financial arrangement with the Supplier Defendants where they provided the Insureds that treated at the Hempstead Turnpike Clinic with prescriptions for a predetermined set of Fraudulent Equipment.

185.    Subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who purportedly received treatment at the Hempstead Turnpike Clinic were purportedly provided with chiropractic treatment from Margulies. Subsequent to their purported follow-up examinations, each of the Insureds were prescribed at least one, but oftentimes two items of Fraudulent Equipment.

186.    When the Insureds' sought treatment at the Hempstead Turnpike Clinic and were purportedly evaluated by Margulis, Margulis did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

187.     Rather, Margulies, prescribed a predetermined set of treatment to each Insured, which included prescriptions for Fraudulent Equipment based upon the fraudulent protocol established with the Supplier Defendants.

188.     In keeping with the fact that the prescriptions for Fraudulent Equipment were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, many of these purported prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued on dates when Margulies did not provide a follow-up examination or other healthcare service to those Insureds.

189.     To the extent that the prescriptions by Margulies for Fraudulent Equipment to the Insureds identified in Exhibit "1" were for issued on a date where Margulies provided a follow-up examination or other healthcare service, the Fraudulent Equipment was still provided pursuant to a predetermined fraudulent protocol as Margulies never indicated in any examination report or other medical record that she was issuing the Fraudulent Equipment to the Insureds.

190.     Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported follow-up examination, Margulies, virtually always prescribed at least one, but oftentimes both of the following Fraudulent Equipment to every Insured identified in Exhibit "1" that he treated: (i) a cervical traction unit; and (ii) a "LSO APL Control".

191.     In keeping with the fact that the prescriptions provided to the Insureds identified in Exhibit "1" were not medically necessary and part of a predetermined fraudulent protocol, when the Insureds were prescribed with both a cervical traction unit and a "LSO APL Control",

Margulies provided a separate prescription for each item when both prescriptions were purportedly issued on the same date.

192.    Upon information and belief, Margulies virtually always issued multiple separate prescriptions on a single date for an individual Insured in order to provide the Supplier Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to avoid detection of their fraudulent schemes.

193.    In keeping with the fact that Margulies issued multiple prescriptions to Insureds on a single date to further the fraudulent scheme, the multiple prescriptions for Fraudulent Equipment could have easily been provided on one single prescription.

194.    There is no legitimate reason why any healthcare provider would need to issue multiple prescriptions to an individual Insured on a single date to be filled by a single DME/OD retailer, including the Supplier Defendants. Even more, there is no legitimate reason why this would occur in a substantial amount of the Insureds identified in Exhibit "1" who treated with Margulies.

195.    For example:

(i)     On January 8, 2019, a patient named SC was purportedly involved in a motor vehicle accident. SC purportedly started treating at the Hempstead Turnpike Clinic on or around January 15, 2019. On February 13, 2019, Margulies issued two prescriptions in the name of SC that were provided to the Supplier Defendants: (i) one prescription for a cervical traction unit; and (ii) a second prescription for a "LSO APL Control".

(ii)    On April 8, 2019, a patient named AZ was purportedly involved in a motor vehicle accident. AZ purportedly started treating at the Hempstead Turnpike Clinic on or around April 11, 2019. On May 3, 2019, Margulies issued two prescriptions in the name of AZ that were provided to the Supplier Defendants: (i) one prescription for a cervical traction unit; and (ii) a second prescription for a "LSO APL Control" despite Margulies not performing a follow-up examination or any other service on AZ on that day.

(iii)   On May 26, 2019, a patient named JB was purportedly involved in a motor vehicle accident. JB purportedly started treating at the Hempstead Turnpike Clinic on or around May 28, 2019. On June 23, 2019, Margulies issued two prescriptions in the name of JB that were provided to the Supplier Defendants: (i) one prescription for a cervical traction unit; and (ii) a second prescription for a "LSO APL Control".

(iv)   On June 7, 2019, a patient named GM was purportedly involved in a motor vehicle accident. GM purportedly started treating at the Hempstead Turnpike Clinic on or around June 12, 2019. On July 5, 2019, Margulies issued two prescriptions in the name of GM that were provided to the Supplier Defendants: (i) one prescription for a cervical traction unit; and (ii) a second prescription for a "LSO APL Control" despite Margulies not performing a follow-up examination or any other service on GM on that day.

(v)   On July 8, 2019, a patient named JB was purportedly involved in a motor vehicle accident. JB purportedly started treating at the Hempstead Turnpike Clinic on or around July 15, 2019. On August 19, 2019, Margulies issued two prescriptions in the name of JB that were provided to the Supplier Defendants: (i) one prescription for a cervical traction unit; and (ii) a second prescription for a "LSO APL Control" despite Margulies not performing a follow-up examination or any other service on JB on that day.

196.   These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received treatment at the Hempstead Turnpike Clinic from Margulies were provided with virtually identical prescriptions for the at least one, but oftentimes both of the following Fraudulent Equipment: (i) cervical traction unit; and (ii) a "LSO APL Control", regardless whether Margulies performed an examination or other healthcare service on the Insureds on the same day.

197.   In keeping with the fact that the prescriptions for Fraudulent Equipment issued at the Hempstead Turnpike Clinic by Margulies were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, to the extent that Margulies drafted a contemporaneously written examination report or progress note, such records did not identify or describe in any way the prescribed Fraudulent Equipment.

198.   In a legitimate setting, when a patient is prescribed DME and/or OD by a healthcare provider, the healthcare provider would indicate in a contemporaneous evaluation report what specific DME and/or OD was prescribed and why.  Such information is typically included in a contemporaneous report so the healthcare provider can recall what he or she previously prescribed and provide proper follow-up questions during a subsequent evaluation.

199.   In keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and provided pursuant to a predetermined fraudulent protocol, to the extent that there were contemporaneous reports, the contemporaneous reports did not contain any sufficient information to explain why Margulies prescribed any of the Fraudulent Equipment.

200.   To the extent that the prescriptions for the Fraudulent Equipment were written on a day where Margulies did not perform an examination or other healthcare service, the examination reports both before and after the prescriptions for Fraudulent Equipment were issued never identified or explained why Margulies prescribed the Fraudulent Equipment.

201.   In fact, none of Margulies's records ever identified or explained why the Insureds identified in Exhibit "1" were prescribed Fraudulent Equipment purportedly provided by the Supplier Defendants.

202.   In a legitimate setting, when a patient returns for a subsequent follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

203.    However, Margulies's follow-up examination reports failed to include any meaningful information – let alone any information – regarding Fraudulent Equipment prescribed to the Insureds on a prior date.

204.    In keeping with the fact that each prescription for Fraudulent Equipment issued by Margulies at the Hempstead Turnpike Clinic was not medically necessary and was part of the fraudulent scheme, virtually all of the prescriptions for cervical traction units and lumbar support braces routinely contravened the Insureds' conservative treatment plans.

205.    For example, Margulies systemically prescribed cervical traction units and lumbar support braces which immobilize the patient while at the same time the Insureds were undergoing physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including the spine.

206.    In this context, the prescriptions for cervical traction units and lumbar support braces completely contravened the mobilizing physical therapy treatments. No legitimate treatment regimen would involve the prescription immobilizing devices while the patient was also undergoing mobilizing physical therapy.

207.    Furthermore, and in keeping with the fact that the prescriptions issued by Margulies to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, virtually all of the prescriptions issued by Margulies contained photocopied signatures.

208.    As part of the fraudulent scheme, Margulies, or someone else at Margulies's direction, used two previously signed prescriptions, one for a cervical traction unit and another for a "LSO APL Control", that were then duplicated and modified to include the patients' name and date of prescription, while and Margulies's signature remained the same.

209.    For example, virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" that were from Margulies were based upon unlawfully duplicated prescription forms that were previously filled out and signed. Thereafter, the unlawfully duplicated prescription forms would be sent to the Supplier Defendants, pursuant to the predetermined fraudulent protocol, and used as the basis to submit fraudulent charges identified in Exhibit "1".

210.    No legitimate physician, chiropractor, other licensed healthcare provider would provide or permit a prescription form containing a signature to be photocopied and used as the basis for providing a prescription to another patient.

211.    Additionally, as part of the fraudulent scheme, the prescriptions issued by Margulies at the Hempstead Turnpike Clinic were never given to the Insureds but were routed directly to the Supplier Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Seneca Avenue Clinic, without any interaction with or instruction concerning their use from either the Supplier Defendants or a healthcare provider.

**D.    The Supplier Defendants' Fraudulent Billing for DME and/or OD**

212.    The bills submitted bills to GEICO and other New York automobile insurers by the Supplier Defendants were also fraudulent in that they misrepresented the DME and OD purportedly provided to the Insureds.

213.    In the bills and other documents submitted to GEICO, the Supplier Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to the unlawful

financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants, either directly or through third-parties who are not presently known.

214.    Further, and as explained below, the bills submitted to GEICO by the Supplier Defendants misrepresented that the Fraudulent Equipment was provided.

215.    To the extent that the Supplier Defendants provided the Insureds with any Fraudulent Equipment, the bills submitted to GEICO by the Supplier Defendants misrepresented that the Fraudulent Equipment matched the HCPCS Codes identified in the bills, when in fact they did not.

### 1) The Supplier Defendants Fraudulently Misrepresented that Fraudulent Equipment was Provided

216.    When the Supplier Defendants submitted bills to GEICO and other New York automobile insurers, they represented that Fraudulent Equipment were actually provided to the Insureds. However, many of the bills for Fraudulent Equipment misrepresented that Fraudulent Equipment were provided to the Insureds because – in reality – the Insureds never received Fraudulent Equipment.

217.    As indicated above, it was part of the Defendants' unlawful financial arrangements and predetermined protocols to allow the Supplier Defendants to maximize the billing submitted to GEICO for PIP Benefits.

218.    Accordingly, the Referral Defendants and other healthcare providers provided medically unnecessary prescriptions to the Supplier Defendants for Fraudulent Equipment, which the Supplier Defendants used as the basis for the bills that they submitted to GEICO.

219.    The Supplier Defendants knew that, without billing for products that they did not provide to Insureds, they would be unable to monetarily maximize the amount of money they could receive from GEICO.

220.     Therefore, the Supplier Defendants created a deceptive scheme where they would submit bills to GEICO for Fraudulent Equipment that they never provided to the Insureds.

221.     Accordingly, in many of the claims identified within Exhibit "1", the Supplier Defendants submitted bills for Fraudulent Equipment that were never actually provided to the Insureds.

222.     As part of its investigation, GEICO confirmed the fraudulent nature of the bills submitted by Supplier Defendants, which are identified in Exhibit "1". In this context, GEICO obtained statements from Insureds, which consistently confirmed that the Supplier Defendants billed for Fraudulent Equipment that they did not provide.

223.     For example:

(i)      On February 9, 2019, an Insured named SS was purportedly injured in a motor vehicle accident. Thereafter, SS sought treatment at the Jerome Avenue Clinic. During her treatment, SS purportedly received a prescription for DME and OD that was subsequently provided to the Supplier Defendants. During an interview with a GEICO investigator, SS confirmed that she never received a cervical traction unit. Despite SS never receiving this item, the Supplier Defendants submitted a bill to GEICO containing a charge for $502.63, which represented that the Supplier Defendants provided SS with a cervical traction unit on April 4, 2019.

(ii)     On February 25, 2019, an Insured named NR was purportedly injured in a motor vehicle accident. Thereafter, NR sought treatment at the Jerome Avenue Clinic. During her treatment, NR purportedly received a prescription for DME and OD that was subsequently provided to the Supplier Defendants. During an interview with a GEICO investigator, NR confirmed that she never received a LSO or cervical traction unit. Despite NR never receiving those items, the Supplier Defendants submitted a bill to GEICO containing charges for: (i) $844.13, which represented that the Supplier Defendants provided NR with a LSO on April 22, 2019; and (ii) $502.63, which represented that the Supplier Defendants provided NR with a cervical traction unit on April 22, 2019.

(iii)    On May 6, 2019, an Insured named JS was purportedly injured in a motor vehicle accident. Thereafter, JS sought treatment at the Jerome Avenue Clinic. During his treatment, JS purportedly received a prescription for

DME and OD that was subsequently provided to the Supplier Defendants. During an interview with a GEICO investigator, JS confirmed that he never received a LSO or cervical traction unit. Despite JS never receiving those items, the Supplier Defendants submitted bills to GEICO containing charges for: (i) $502.63, which represented that the Supplier Defendants provided JS with a cervical traction unit on June 18, 2019; and (ii) $844.13, which represented that the Supplier Defendants provided JS with a LSO on July 16, 2019.

(iv)     On May 22, 2019, an Insured named PP was purportedly injured in a motor vehicle accident. Thereafter, PP sought treatment at a multidisciplinary clinic located at 227A East 105th Street, New York, New York. During her treatment, PP purportedly received a prescription for DME and OD that was subsequently provided to the Supplier Defendants. During an interview with a GEICO investigator, PP confirmed that she never received a LSO or cervical traction unit. Despite PP never receiving those items, the Supplier Defendants submitted a bill to GEICO containing charges for: (i) $844.13, which represented that the Supplier Defendants provided PP with a LSO on August 14, 2019; and (ii) $502.63, which represented that the Supplier Defendants provided PP with a cervical traction unit on August 14, 2019.

(v)     On September 21, 2019, an Insured named JM was purportedly injured in a motor vehicle accident. Thereafter, JM sought treatment at the Jerome Avenue Clinic. During his treatment, JM purportedly received a prescription for DME and OD that was subsequently provided to the Supplier Defendants. During an interview with a GEICO investigator, JM confirmed that he never received a LSO or cervical traction unit. Despite JM never receiving those items, the Supplier Defendants submitted a bill to GEICO containing charges for: (i) $844.13, which represented that the Supplier Defendants provided JM with a LSO on October 28, 2019; and (ii) $502.63, which represented that the Supplier Defendants provided JM with a cervical traction unit on October 28, 2019.

224.   In many of the claims identified within Exhibit "1", the Supplier Defendants fraudulently misrepresented in their billing to GEICO that they provided Fraudulent Equipment to the Insureds and were therefore eligible to collect No-Fault Benefits in the first instance.

### 2) The Supplier Defendants' Fraudulent Misrepresented the Fraudulent Equipment Purportedly Provided

225.    When the Supplier Defendants' submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

226.    As indicated above, the New York Fee Schedule provides that the Medicaid Fee Schedule is used to determine the amount to pay for Fee Schedule items. The Medicaid Fee Schedule specifically defines the requirements for each HCPCS code used to bill for DME and/or OD.

227.    Additionally, Noridian provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS code.

228.    By submitting bills to GEICO containing specific HCPCS Codes the Supplier Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

229.    However, in virtually all of the bills submitted to GEICO, the Supplier Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

230.    The Supplier Defendants supported their bills to GEICO by including prescriptions for medically unnecessary Fraudulent Equipment that they obtained, as indicated above, from healthcare providers, including the Referral Defendants, as a result of predetermined fraudulent protocols due to unlawful financial arrangements.

231.    However, and regardless whether the prescriptions were for medically necessary items, the Supplier Defendants billed GEICO using HCPCS Codes that misrepresented the type

of Fraudulent Equipment purportedly provided to the Insureds, to the extent that the Supplier Defendants even provided any .

232.    In fact, even when the prescription contained a specific HCPCS code for Fraudulent Equipment, to the extent that the Supplier Defendants provided any Fraudulent Equipment, the Fraudulent Equipment provided failed to correspond with the HCPCS Codes contained on the prescriptions, which were the same HCPCS codes contained on the bills submitted to GEICO.

233.    For example, as identified in the claims contained within Exhibit "1", the Supplier Defendants used medically unnecessary prescriptions to bill GEICO for hundreds of lumbar orthotics under HCPCS Code L0637 with a charge of $844.13 per unit.

234.    However, the bills to GEICO for HCPCS Code L0637 fraudulently misrepresented the type of Fraudulent Equipment the Supplier Defendants purportedly provided to Insureds as the lumbar orthotics they provided – to the extent that the lumbar orthotics were actually provided – were not reimbursable under HCPCS Code L0637.

235.    HCPCS Code L0637 is a Fee Schedule item and is defined as follows:

> Lumbar sacral orthosis, sagittal-coronal control, with rigid anterior and posterior frame/panels, posterior extends from sacrococcygeal junction to T-9 vertebra, lateral strength provided by rigid lateral frame/panels, produces intracavitary pressure to reduce load on intervertebral discs, includes straps, closures, may include padding, shoulder straps, pendulous abdomen design, prefabricated item that has been trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise

236.    Essentially, the product assigned to HCPCS Code L0637 is back brace with rigid panels for the anterior and posterior parts of the lumbar spine that has been customized to fit a specific patient by an individual with expertise.

237.     However, despite billing GEICO – and other New York automobile insurers –
using HCPCS Code L0637, the specific lumbar orthotic provided by the Supplier Defendants –
to the extent that the Supplier Defendants provided the Insureds with any lumbar orthotics – did
not contain the requirements set forth in HCPCS Code L0637 as they were not customized to fit
a specific patient by an individual with expertise.

238.     In each of the claims identified within Exhibit "1" where the Supplier Defendants
billed for Fraudulent Equipment under HCPCS Code L0637, each of the bills fraudulently
mispresented that the Supplier Defendants provided the Insureds with equipment that satisfied
the requirements of HCPCS Code L0637.

239.     To the extent that any of the charges identified in Exhibit "1" for custom-fitted
OD, including the claims for HCPCS Code L0637, were provided, the Supplier Defendants did
not customize the equipment as required by Noridian.

240.     In order to help clarify the term "custom fitted", Noridian defined a custom fitted
orthotic as something that "requires more than minimal self-adjustment at the time of delivery in
order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or
without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment."
See Noridian, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted
Prefabricated Orthotics (Braces) – Revised.

241.     One of the key factors in identifying a "custom-fitted" orthotic is whether the item
requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment,
which is for off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or
supplier of the device can perform and that does not require the services of a certified orthotist
(that is, an individual who is certified by the American Board for Certification in Orthotics and

Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." See Noridian, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

242.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Noridian, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

243.    Abayev, the only employee at Big Apple, is not certified by the American Board for Certification in Orthotics and Prosthetics, Inc. or by the Board for Orthotist/Prosthetist Certification.

244.    In the claims identified in Exhibit "1" for HCPCS Code L0637, the Supplier Defendants fraudulently misrepresented that the OD was custom-fitted, as defined by Noridian, and was done so by a certified orthotist.

245.    Instead, to the extent that the Suppler Defendants provided any Fraudulent Equipment billed to GEICO under HCPCS Code L0637, the Supplier Defendants dropped off the Fraudulent Equipment without taking any action to custom-fit the OD.

246.    To the extent that the Suppler Defendants attempted to make any adjustments to the Insureds identified in Exhibit "1" that received Fraudulent Equipment billed to GEICO under HCPCS Code L0637, the Suppler Defendants only provided minimal self-adjustment, as defined by Noridian, which does not support charges for HCPCS L0637.

247.    Similar to the charges under HCPCS L0637, the claims identified in Exhibit "1" for HCPCS Code L1832 also fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds – to the extent that Fraudulent Equipment were actually provided.

248.    The bills to GEICO for HCPCS Code L1832 fraudulently misrepresented the type of Fraudulent Equipment the Supplier Defendants purportedly provided to Insureds as the knee orthotics they provided – to the extent that the knee orthotics were actually provided – were not reimbursable under HCPCS Code L1832.

249.    HCPCS Code L1832 is a Fee Schedule item and is defined as follows:

Knee orthosis, adjustable knee joints (unicentric or polycentric), positional orthosis, rigid support, prefabricated item that has been trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise

250.    Essentially, the product assigned to HCPCS Code L1832 is knee brace with adjustable knee joints that has been customized to fit a specific patient by an individual with expertise.

251.    However, despite billing GEICO – and other New York automobile insurers – using HCPCS Code L1832, the specific knee orthotic provided by the Supplier Defendants – to the extent that the Supplier Defendants provided the Insureds with any knee orthotics – did not contain the requirements set forth in HCPCS Code L1832 because they were not customized to fit a specific patient by an individual with expertise.

252.    Upon information and belief, to the extent that any of the charges identified in Exhibit "1" for HCPCS Code L1832 were provided, the Supplier Defendants did not customize the equipment as required by Noridian and detailed above.

253.    In the claims identified in Exhibit "1" for HCPCS Code L1832, the Supplier Defendants fraudulently misrepresented that the OD was custom-fitted, as defined by Noridian, and was done so by a certified orthotist.

254.    Instead, to the extent that the Suppler Defendants provided any Fraudulent Equipment billed to GEICO for HCPCS Code L1832, the Supplier Defendants dropped off the Fraudulent Equipment without taking any action to custom-fit the OD.

255.    To the extent that the Suppler Defendants attempted to make any adjustments to the Insureds identified in Exhibit "1" that received Fraudulent Equipment billed to GEICO under HCPCS Code L1832, the Supplier Defendants only provided minimal self-adjustment, as defined by Noridian, which does not support charges for HCPCS L1832.

256.    In all of the claims identified in Exhibit "1" for custom-fitted OD, the Supplier Defendants fraudulently misrepresented that they provided Fraudulent Equipment that were custom-fitted to each Insured, as required by Noridian, when they were not and, thus, not eligible to collect No-Fault Benefits in the first instance.

III.    **The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

257.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Big Apple, seeking payment for Fraudulent Equipment.

258.   The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Supplier Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with the healthcare providers, including the Referral Defendants, either directly or through third-parties who are presently unknown; and (b) predetermined fraudulent protocols without regard for the medical necessity of the items.

(ii)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment to Insureds, and therefore were eligible to receive no-fault benefits. In fact, the Supplier Defendants were not entitled to receive no-fault benefits because the Supplier Defendants did not provide the Insureds with the Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, and prescription forms.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Supplier Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and prescription forms.

**IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

259.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

260.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

261.    Specifically, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided to the Supplier Defendants, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

262.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon predetermined protocols and without medical necessity in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

263.    Furthermore, the Defendants knowingly misrepresented and concealed that they did not provide some of the Fraudulent Equipment that was billed to GEICO, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

264.    Lastly, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Supplier Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

265.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification

documents to determine whether the charges submitted through the Defendants were legitimate. Nevertheless, in an attempt to conceal their fraud, the Defendants failed and/or refused to respond to all of GEICO's requests for verification of the charges submitted.

266.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

267.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

268.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation and/or arbitrations against GEICO and other insurers if the charges were not promptly paid in full.

269.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $122,000.00 based upon the fraudulent charges.

270.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Big Apple**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

271.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 270 of this Complaint as if fully set forth at length herein.

272.     There is an actual case in controversy between GEICO and Big Apple regarding more than $1,000,000.00 in fraudulent billing that has been submitted to GEICO in the name of Big Apple.

273.     Big Apple has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

274.     Big Apple also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich Big Apple, the other Defendants, and others who are not presently known, rather than to treat the Insureds.

275.     Big Apple has no right to receive payment for any pending bills submitted to GEICO because – to the extent Big Apple actually provided any Fraudulent Equipment – Big Apple fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

276.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO in the name of Big Apple.

**SECOND CAUSE OF ACTION**
**Against Abayev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

277.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 270 of this Complaint as if fully set forth at length herein.

278.    Big Apple is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

279.    Abayev knowingly conducted and/or participated, directly or indirectly, in the conduct of Big Apple's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Big Apple was not eligible to receive under the New York No-Fault Laws because: (i) Big Apple submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Big Apple submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed solely to financially enrich the Defendants; (iii) Big Apple submitted bills to GEICO for Fraudulent Equipment that it never provided to Insureds; and (iv) to the extent that Big Apple actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the items actually provided.  A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity

identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

280.    Big Apple's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Abayev operates Big Apple, insofar as Big Apple is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Big Apple to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Abayev continues to submit and attempt collection on the fraudulent billing submitted by Big Apple to the present day.

281.    Big Apple is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Big Apple in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

282.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $122,000.00 pursuant to the fraudulent bills submitted through Big Apple.

283.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Abayev, Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

284.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 270 of this Complaint as if fully set forth at length herein.

285.    Big Apple is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

286.    Abayev, Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10 are owners of, employed by, or associated with the Med Equipment enterprise.

287.    Abayev, Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Big Apple's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for close to two years seeking payments that Big Apple was not eligible to receive under the New York No-Fault Laws because: (i) Big Apple submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Big Apple submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed solely to financially enrich the Defendants; (iii) Big Apple submitted bills to GEICO for Fraudulent Equipment that it never provided to Insureds; and (iv) to the extent that Big Apple actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the items actually provided. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the

chart annexed hereto as Exhibit "1".  Each such mailing was made in furtherance of the mail fraud scheme.

288.     Abayev, Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

289.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $122,000.00 pursuant to the fraudulent bills submitted through Big Apple.

290.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Big Apple and Abayev**
**(Common Law Fraud)**

291.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 270 of this Complaint as if fully set forth at length herein.

292.     Big Apple and Abayev intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

293.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements and not based upon medical necessity, which were

used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iii) in many claims, that Fraudulent Equipment were provided to the Insureds when the Fraudulent Equipment were never provided; and (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO.

294.    Big Apple and Abayev intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Big Apple that were not compensable under the No-Fault Laws.

295.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $122,000.00 pursuant to the fraudulent bills submitted by the Supplier Defendants through Big Apple.

296.    The Supplier Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

297.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Big Apple and Abayev**
**(Unjust Enrichment)**

298.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 270 of this Complaint as if fully set forth at length herein.

299.    As set forth above, the Supplier Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

300.    When GEICO paid the bills and charges submitted by or on behalf of Big Apple for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Supplier Defendants' improper, unlawful, and/or unjust acts.

301.    The Supplier Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Supplier Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

302.    The Supplier Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

303.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $122,000.00.

### SIXTH CAUSE OF ACTION
**Against Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10**
**(Aiding and Abetting Fraud)**

304.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 270 of this Complaint as if fully set forth at length herein.

305.    Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10 knowingly aided and abetted the fraudulent scheme perpetrated against GEICO by the Supplier Defendants.

306.    The acts taken by Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10 in furtherance of the fraudulent scheme include knowingly: (i) provided prescriptions for Fraudulent Equipment that were billed to GEICO by the Supplier Defendants as a result of unlawful financial arrangements; (ii) provided prescriptions for Fraudulent Equipment that were billed to GEICO by the Supplier Defendants pursuant to predetermined fraudulent protocols and without regard for medical necessity; (iii) participated in each of the foregoing acts with knowledge that the prescriptions would be used by the Supplier Defendants to support their fraudulent claims; and (iv) ensured that the prescriptions for Fraudulent Equipment were given to the Supplier Defendants rather than to the patients.

307.    The conduct of Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10, as more fully described above, were in furtherance of the fraudulent scheme and were significant and material.

308.    The conduct of Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10, as more fully described above, were a necessary part of and were critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for the Supplier Defendants to bill GEICO for Fraudulent Equipment.

309.    Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10 each aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges for Fraudulent Equipment that were not compensable under the No-Fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

310.     The conduct of Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10 caused GEICO to pay money based upon the fraudulent charges submitted to it through Big Apple in an amount to be determined at trial, but in no event less than $122,000.00.

311.     The extensive fraudulent conduct of Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10 demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

312.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

313.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Big Apple, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Big Apple has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of action against Abayev, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $122,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Abayev, Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be

determined at trial but in excess of $122,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Big Apple and Abayev, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $122,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Big Apple and Abayev, more than $122,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

F.      On the Sixth Cause of Action against Mostovoy, Paulus, Kiaei, Margulies, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $122,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated:  November 30, 2020
        Uniondale, New York

                                      RIVKIN RADLER LLP

                                      By: */s/ Barry I. Levy*
                                          Barry I. Levy (BL 2190)
                                          Michael A. Sirignano (MS 5263)
                                          Michael Vanunu (MV 4167)
                                        Philip P. Nash (PN 0519)
                                926 RXR Plaza
                                Uniondale, New York 11556
                                (516) 357-3000

                                *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*